# IN THE SUPREME COURT OF IOWA

No. 15–0752

Filed February 10, 2017

Amended April 19, 2017

**STATE OF IOWA,**

Appellee,

vs.

**JAYEL ANTRONE COLEMAN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Christine Dalton Ploof, District Associate Judge.

Defendant appeals conviction for driving while barred. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

Micki M. Meier of Meier Law Firm, Davenport, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, Michael J. Walton, County Attorney, and Robert C. Bradfield and Steve Berger, Assistant County Attorneys, for appellee.

**APPEL, Justice.**

In this case, we consider whether a law enforcement officer, after making a valid traffic stop supported by reasonable suspicion that an offense may be being committed, must terminate the stop when the underlying reason for the stop is no longer present. For the reasons expressed below, we hold that under the search and seizure provision of article I, section 8 of the Iowa Constitution, the stop must end when reasonable suspicion is no longer present.

## I. Factual and Procedural Background.

On the evening of August 18, 2014, Officer James Morris was parked along Highway 61 in Eldridge, Iowa, conducting random computer checks on the license plates of passing motorists to see if the vehicle was reported stolen or if there were outstanding warrants associated with the owner of the vehicle. His check of the license plate of a vehicle that passed him revealed that the female registered owner, Arvis Quinn, had a suspended driver's license.

Because it was dark, Morris could not determine when the vehicle passed him whether the driver was male or female. Morris pulled the vehicle registered to Quinn over to investigate the possibility that Quinn was driving the vehicle while her license was under suspension. As Morris approached the vehicle, it was clear to Morris that the driver was male, not female.

Morris did not terminate the stop upon determining that Quinn was not the driver of the vehicle. Instead, Morris proceeded to ask the driver of the vehicle, Jayel Coleman, for his license, registration, and proof of insurance. Coleman did not produce a registration but did produce "an Iowa ID." Coleman stated that he was driving a vehicle he had borrowed from his sister. At the time Morris made his requests,

Morris no longer had reasonable suspicion that a traffic offense had been committed.

Based on Coleman's identification, Morris determined that Coleman was driving while barred in violation of Iowa Code sections 321.555(1) and 321.561 (2013). He was so charged. Coleman filed a pretrial motion to suppress with the district court. The district court denied the motion. After a bench trial, Coleman was convicted of the offense.

Coleman appealed. We transferred the case to the court of appeals. The court of appeals affirmed the conviction. Coleman sought further review, which we granted. For the reasons expressed below, we vacate the decision of the court of appeals and reverse the judgment of the district court.

## II. Standard of Review.

We review the district court's denial of a motion to suppress on constitutional grounds de novo. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). In reviewing a search and seizure dispute under article I, section 8 of the Iowa Constitution, we construe the provision "in a broad and liberal spirit." *State v. Height*, 117 Iowa 650, 657, 661, 91 N.W. 935, 937–38 (1902) (construing fundamental guarantees, like the right against self-incrimination, broadly and liberally). We strongly favor the warrant requirement, subject only to "jealously and carefully drawn exceptions." *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992); *accord State v. Ochoa*, 792 N.W.2d 260, 285 (Iowa 2010). In interpreting article I, section 8, we may look to federal caselaw, the caselaw of other states, the dissenting opinions of state and federal courts, and to secondary materials for their persuasive power. *State v. Short*, 851 N.W.2d 474, 481 (Iowa 2014).

### III. Issue Preservation.

We must initially confront issue preservation. In the district court proceedings, Coleman did not identify either the Iowa or the Federal Constitution in support of his motion to suppress. Further, the district court, in its ruling, simply stated that the motion to suppress was denied.

On appeal, Coleman cites both article I, section 8 of the Iowa Constitution and the Fourth Amendment. Coleman essentially makes the same argument under both constitutional provisions—namely, that the seizure of Coleman could not be constitutionally extended once the underlying reason for the stop was resolved.

The State does not contest error preservation. In its briefing on appeal, the State recognizes that Coleman has made claims under article I, section 8 and the Fourth Amendment. Like Coleman, the State makes the same argument under both constitutional provisions. The State asserts that prolonging the stop to ask for a driver's license, registration, and proof of insurance is permissible.

We find the state constitutional issue is minimally preserved. We have held that when a defendant in the trial court only identifies the Fourth Amendment as the basis for a search and seizure claim, the state constitutional claim has not been preserved at the district court. *State v. Prusha*, 874 N.W.2d 627, 630 (Iowa 2016).[1]

---

[1]As in *Prusha*, counsel here does not make a claim for ineffective assistance of counsel in this appeal. When trial counsel fails to preserve an issue below, appellate counsel may, of course, on appeal assert a claim of ineffective assistance. *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). When the ineffective-assistance claim does not require further development of the factual record, we may decide the claim on direct appeal even though the underlying issue was not preserved in the trial court. *Id.* When the claim of ineffective assistance cannot be resolved on the record, however, we will decline to rule on direct appeal and a party may file an action for postconviction

Here, however, the defendant did not identify *either* constitution in the trial court although it was apparent that he was raising a search and seizure claim. This raises a different preservation question than that presented in *Prusha.* We have said that when a party brings a constitutional claim but fails to identify whether the party is proceeding under the Iowa or the Federal Constitution, claims under both the Iowa and the Federal Constitutions are preserved. *State v. Harrington,* 805 N.W.2d 391, 393 n.3 (Iowa 2011); *King v. State,* 797 N.W.2d 565, 571 (Iowa 2011). The State impliedly recognized our prior caselaw by declining to challenge issue preservation under the Iowa Constitution and addressing both claims. We adhere to the approach in *Harrington* and *King.*

On appeal, Coleman did not state the claim under the Iowa Constitution should be evaluated under a standard different than that employed by the United States Supreme Court in Fourth Amendment cases. Nonetheless, he makes only one argument on appeal, namely, that once reasonable suspicion for the original traffic stop was resolved, the State could not extend the stop by asking for Coleman's driver's license, registration, and insurance. It would elevate form over substance to declare that Coleman's argument actually cannot be considered under the Iowa Constitution because he did not specifically state that he was asking the court to depart from uncertain federal law. In any event, we reserve the right to apply principles established in the federal caselaw in a fashion different from prevailing federal law. *See, e.g., State v. Pals,* 805 N.W.2d 767, 771–72 (Iowa 2011); *State v.*

---

relief where the record can be more fully developed. *State v. Tate,* 710 N.W.2d 237, 240 (Iowa 2006).

*Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009). Under these circumstances, the argument Coleman specifically made and specifically asks us to resolve is preserved under the Iowa Constitution.

**IV. Discussion.**

**A. Introduction.** The question of whether an automobile stop may be extended to require production of documents may sound mundane, and even petty, but it is not. Thousands of persons drive upon the roadways daily. Further, the central purpose of constitutional provisions regarding search and seizure is to structure and limit the scope of police interference in the daily life of citizens. Generalized police discretion to engage in search and seizure is antithetical to search and seizure law. *See Ochoa*, 792 N.W.2d at 287.

Further, as we have noted previously, unlimited discretion to stop vehicles on the open road may give rise to allegations of racial discrimination, characterized by the descriptive phrase "driving while black." *See State v. Lyon*, 862 N.W.2d 391, 397 (Iowa 2015); *see also State v. Harrison*, 846 N.W.2d 362, 371–72 (Iowa 2014) (Appel, J., dissenting); *Pals*, 805 N.W.2d at 772 n.2; David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 546–47 (1997).

As noted in *Pals*, traffic stops have emerged as a major issue in search and seizure law. 805 N.W.2d at 772–73. The use of minor traffic violations as a springboard into consent searches has prompted charges of abuse and racial profiling. *Id.* at 772; *see also* Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221, 235–36 (1989).

Indeed, the cases dealing with automobile stops sometimes have a flavor of racial profiling. *See State v. Diaz-Ruiz*, 211 P.3d 836, 846 (Kan. Ct. App. 2009) (questioning credibility of officer because facts demonstrated trooper was motivated by a "desire to search the vehicle of these two Hispanic men"). As we said in *Pals*, we approach these issues with

> due regard to the legitimate needs of law enforcement, but with a recognition that our constitutional limitations on searches and seizures by law enforcement protect fundamental values of liberty and human dignity and are a bulwark against arbitrary governmental intrusions into the lives of citizens.

805 N.W.2d at 773.

**B. Scope of Issues.** The parties do not dispute that stopping an automobile and detaining its occupants is a seizure under article I, section 8 and the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979). Further, the parties do not dispute that Morris initially had sufficient reasonable suspicion under both constitutions to initiate a traffic stop under the facts and circumstances of this case. Further, the parties do not dispute that once Morris determined that Coleman was a male, the reasonable suspicion that triggered the stop was no longer present. The narrow question here, which is strictly a legal question, is whether law enforcement may extend the traffic stop by asking for a driver's license, vehicle registration, and proof of insurance.

**C. Federal Caselaw Under the Fourth Amendment.**

1. *Analytic framework applicable to automobile stops.* The United States Supreme Court has developed a framework for the evaluation of automobile stops under the Fourth Amendment. The foundation for analysis of an automobile stop is provided in *Terry v. Ohio*, 392 U.S. 1,

88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Although *Terry* did not involve an automobile stop, the Supreme Court has considered a routine traffic stop more analogous to a *Terry* stop than a formal arrest. *See Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 488, 142 L. Ed. 2d 492, 498 (1998); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317, 334 (1984).

The United States Supreme Court applied *Terry* principles in the context of an automobile stop in *Prouse*, 440 U.S. at 648, 99 S. Ct. at 1391, 59 L. Ed. 2d at 660. In *Prouse*, the Supreme Court considered the question of whether a law enforcement officer may perform a random traffic stop for the purpose of checking license and registration when there is no probable cause or reasonable suspicion that any violation of law is occurring. *Id.* at 650, 99 S. Ct. at 1394, 59 L. Ed. 2d at 665.

The *Prouse* Court held that such random stops violated the Fourth Amendment. *Id.* at 663, 99 S. Ct. at 1401, 59 L. Ed. 2d at 673. While *Prouse* recognized the legitimacy of the state's general interest in safety as advanced by license and registration requirements, the *Prouse* Court was "unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.* at 658–59, 99 S. Ct. at 1398–99, 59 L. Ed. 2d at 670–71. According to the *Prouse* Court,

> [W]e cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

*Id.* at 661, 99 S. Ct. at 1400, 59 L. Ed. 2d at 672.

The United States Supreme Court refined the *Prouse* analysis in *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). In the plurality opinion in *Royer*, the Court emphasized that the scope of an investigatory stop "must be carefully tailored to its underlying justification" and "last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 500, 103 S. Ct. at 1325, 75 L. Ed. 2d at 238. In *Royer*, the Supreme Court plurality emphasized that a person "may not be detained *even momentarily* without reasonable, objective grounds for doing so." *Id.* at 498, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236 (emphasis added).

The Supreme Court confronted another traffic-stop controversy in *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). In *Caballes*, the Supreme Court considered whether a dog sniff conducted during a lawful traffic stop violated the Fourth Amendment. *Id.* at 406–07, 125 S. Ct. at 836–37, 160 L. Ed. 2d at 845–46. The *Caballes* Court concluded that it did not. *Id.* at 409, 125 S. Ct. at 838, 160 L. Ed. 2d at 847. The *Caballes* Court viewed a dog sniff as "sui generis"—unique, in other words—because it revealed only the presence or absence of contraband and, therefore, was not a search. *Id.* Even if a dog sniff is not a search, the *Caballes* Court recognized "[a] seizure . . . can become unlawful if it is prolonged beyond the time reasonably required to complete [the initial] mission." *Id.* at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846. In *Caballes*, the Illinois Supreme Court had determined, as a matter of fact, that the duration of the stop was justified by the underlying traffic offense. *Id.* at 408, 125 S. Ct. at 837, 160 L. Ed. 2d at 846–47. According to the *Caballes* Court, a dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has

any right to possess does not violate the Fourth Amendment. *Id.* at 410, 125 S. Ct. at 838, 160 L. Ed. 2d at 848.

Justices Souter and Ginsburg dissented. Justice Souter forcefully argued that a dog sniff was, in fact, a search just like thermal imaging equipment in *Kyllo*. *Id.* at 413, 125 S. Ct. at 840, 160 L. Ed. 2d at 850 (Souter, J., dissenting) (citing *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001)). Such a search ancillary to a traffic stop, according to Justice Souter, must be supported by reasonable suspicion. *Id.* at 415, 125 S. Ct. at 841, 160 L. Ed. 2d at 851. According to Justice Souter, to search for evidence unrelated to the reason for the detention amounts to an "open-sesame" for general searches that the Fourth Amendment was designed to prohibit. *Id.*

In her dissent, Justice Ginsburg emphasized that in *Terry*-type stops, the limitation related to the "scope" of the seizure was not limited to duration, but also to the manner in which it is conducted. *Id.* at 418, 125 S. Ct. at 843–44, 160 L. Ed. 2d at 853–54 (Ginsburg, J., dissenting) (citing *Terry*, 392 U.S. at 1, 88 S. Ct. at 1868, 20 L. Ed. 2d at 889). Justice Ginsburg thus did not find it dispositive that the length of the stop was not extended. *Id.* at 420, 125 S. Ct. at 844, 160 L. Ed. 2d at 854–55.

Shortly after *Caballes*, the Supreme Court returned to the general topic of automobile seizures in *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). In *Johnson*, the Supreme Court confronted the question of whether passengers in a lawfully stopped vehicle could be subject to a *Terry*-type pat-down. *Id.* at 326, 129 S. Ct. at 784, 172 L. Ed. 2d at 700. The Supreme Court concluded that officers who conduct routine traffic stops may engage in pat-downs of a driver

and any passenger upon reasonable suspicion that they are armed and dangerous. *Id.* at 332, 129 S. Ct. at 787, 172 L. Ed. 2d at 703.

2. *Federal caselaw applying* Terry-Prouse-Royer *principles to extended automobile stops.* The United States Court of Appeals for the Tenth Circuit has led the way in considering several traffic-stop cases in which the stop was extended after the underlying purposes were resolved. A frequently cited case in the field is *United States v. McSwain,* 29 F.3d 558 (10th Cir. 1994). In *McSwain,* the sole purpose of a traffic stop was to verify the expiration date on a temporary registration sticker on the rear window of the vehicle. *Id.* at 559–60. Once the officer determined the temporary registration sticker remained valid, the court held that "further detention of the vehicle to question [the defendant] about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification." *Id.* at 561.

*McSwain* thus drew a "sharp contrast" between a situation where a traffic violation "has occurred or is occurring" and one where the reasonable suspicion for the stop had been completely dispelled. *Id.* (quoting *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir. 1993)). Only in the later circumstance did the lawfulness of the seizure come to an end. *Id.* at 562.

In the next case, *United States v. Edgerton,* the Tenth Circuit again considered a case in which a vehicle was stopped because a temporary registration tag could not be read because of darkness. 438 F.3d 1043, 1044 (10th Cir. 2006). The Tenth Circuit held, however, that once the trooper was able to read the temporary tag, the trooper "as a matter of courtesy, should have explained to [the] Defendant the reason for the

initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Id.* at 1051.

A third Tenth Circuit case is *United States v. Pena-Montes*, 589 F.3d 1048 (10th Cir. 2009). In that case, the *Pena-Montes* court confronted the familiar situation in which an officer pulled over a vehicle believing it lacked a license plate, only to discover that the vehicle had a proper "dealer tag." *Id.* at 1049. In *Pena-Montes*, the officer did not end the stop at that point, but continued his investigative activities, questioning a passenger about his immigration status. *Id.* at 1051. After canvassing the facts, the *Pena-Montes* court concluded that no additional reasonable suspicion was present. *Id.* at 1058. In response to the government's argument that it is reasonable for officers to enquire about dealer tags after a traffic stop even if they appeared lawful, the *Pena-Montes* court declared, "We decline to sign this blank check." *Id.*

Finally, in *United States v. Trestyn*, the Tenth Circuit considered a similar case in which a vehicle was missing a front license plate, but displayed a rear license plate. 646 F.3d 732, 736 (10th Cir. 2011). As in the other cases, when approaching the vehicle, it became clear that the rear license plate satisfied all statutory requirements. *Id.* at 744. At that point, according to the Tenth Circuit, questions of the drivers about their travel plans and a request for their licenses "exceeded the scope of the stop's underlying justification because . . . [the officer] no longer had an objectively reasonable articulable suspicion that a traffic violation had occurred or was still occurring." *Id.*

Another frequently cited case involving extended automobile searches is the Fifth Circuit case of *United States v. Valadez*, 267 F.3d 395 (5th Cir. 2001). In *Valadez*, an officer who passed a motorist traveling in the opposite direction believed the motorist was operating a

vehicle with an expired vehicle registration and illegal window tinting and initiated a traffic stop. *Id.* at 396. When the officer approached the vehicle and spoke with the driver, Valadez, the registration issue was quickly resolved, but the window tinting issue remained. *Id.* The officer asked Valadez for his driver's license and insurance card. *Id.* When he returned to his patrol car, the officer requested a criminal history check on Valadez. *Id.* While the background check was still in progress, the officer returned to Valadez's vehicle with a window-tint meter and determined the windows were legal. *Id.*

But the officer did not terminate the encounter at this point. *Id.* Although the purpose of the stop had been resolved, the officer proceeded to ask Valadez if he had any weapons or drugs in the vehicle. *Id.* Valadez responded that he had a loaded pistol in the front seat of the car and a rifle in the trunk. *Id.* The officer removed the weapons from the car to run a check to determine if they were stolen. *Id.* The results of his background check indicated that Valadez had a criminal history but did not apparently indicate whether it involved misdemeanors or felonies. *Id.* The officer returned to Valadez's vehicle and asked him whether he had a felony conviction. *Id.* Valadez responded that he was not sure, but that he might have a felony conviction. *Id.* After being transported to the station, Valadez's prior conviction was confirmed as a felony. *Id.* at 397. He was subsequently charged with the crime and entered a conditional guilty verdict allowing him to contest an unfavorable suppression ruling. *Id.*

The Fifth Circuit reversed the district court's denial of Valadez's motion to suppress. *Id.* at 399. The Fifth Circuit noted that Valadez did not dispute the initial lawfulness of the stop. *Id.* at 398. But the Fifth Circuit reasoned that once the officer determined that the registration

was valid and the window tinting was lawful, at that point he had no basis to continue the stop. *Id.* The Fifth Circuit emphasized the detention was lawful up until the purposes of the stop were resolved, but when those purposes were resolved, there was no lawful reason to detain Valadez. *Id.*

The Sixth Circuit considered the validity of an extension of a traffic stop in *United States v. Jones*, 479 F. App'x 705 (6th Cir. 2012). In *Jones*, the Sixth Circuit held that a police officer exceeded the scope of a traffic stop for failure to display proper license plates when he detained the driver after he observed a lawful temporary tag in plain view. *Id.* at 712; *see also United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.").

The Second Circuit grappled with an automobile stop in *United States v. Jenkins*, 452 F.3d 207 (2d Cir. 2006). In *Jenkins*, the officers believed that the vehicle pulled over lacked appropriate license plates. *Id.* at 209. After the stop, the officer became aware of a temporary plate posed on the vehicle. *Id.* When the officers approached the vehicle to speak to the driver, however, they smelled marijuana. *Id.* A subsequent search turned up unlawfully possessed firearms. *Id.* at 210.

The fighting issue in *Jenkins* was whether the police acted lawfully after their concern about unlawful licensure had been resolved. *Id.* at 212–13. The defendant claimed that once the officers observed the temporary license plate they could proceed no further and were required simply to waive the motorist on. *Id.* at 211. The state contended that

the officers could reasonably approach the driver to explain the reason for the stop. *Id.* The Second Circuit agreed, noting that in *McSwain*, the Tenth Circuit suggested in dictum that such a courtesy was not unlawful. *Id.* at 213.

A number of reported United States district court decisions follow the general approach of the Second, Fifth, Sixth, and Tenth Circuits. In *United States v. Salinas*, the United States district court considered a case where a stop was initiated because of suspicion of a violation of the Texas license plate display requirement. 665 F. Supp. 2d 717, 718–19 (W.D. Tex. 2009). The district court noted that the officers could have determined even before they asked for the driver's license and proof of insurance that there was not a violation of the Texas license plate requirement. *Id.* at 721. Because "[t]hey did not encounter reasonable suspicion of an additional violation—driving without a license—until after his traffic stop for failure to display a front license plate should have ended," the evidence should have been suppressed. *Id.*; *see also United States v. Castro*, 929 F. Supp. 2d 1140, 1152 (D.N.M. 2013) ("[O]nce the officer's suspicion that a traffic violation occurred is dispelled, prolonging the detention by retaining the defendant's identification, questioning the defendant further, or waiting for the outcome of a computer check, even if the check is in progress, is improper and a violation of the Fourth Amendment.").

In *United States v. Smith*, the United States district court considered whether a traffic stop could be extended in an obscured license plate case. 37 F. Supp. 3d 806, 808 (M.D. La. 2014). The district court determined that once the license plate issue was resolved, there was no further basis to detain the driver. *Id.* at 813–14. In *Smith*, the roadside officer had received statements from another officer that the

motorist was believed to be a member of a motorcycle gang and suspected drug dealer. *Id.* at 812–13. This alone, however, did not justify prolonging the search. *Id.* at 813. While the state argued that officer safety was involved, the court rejected the argument, noting among other things that the officers did not act as if they were in fear of their safety, did not conduct pat-downs of either occupant of the car prior to their eventual arrest, and did not isolate them out of the car in order to separate them from a potential weapon. *Id.*

Finally, a federal district court in Iowa considered a traffic-stop issue similar to that raised in this case. In *United States v. Wise*, Chief Judge Longstaff considered a prolonged detention after any potential reason for the stop—a question about temporary tags—had been resolved. 418 F. Supp. 2d 1100, 1102 (S.D. Iowa 2006). Relying on *Edgerton*, Judge Longstaff concluded that the deputy unlawfully detained the defendants when they asked for identification and brought one of the defendants back to the police car, because his investigation was no longer related to the purpose of the stop. *Id.* at 1108.

The Eighth Circuit, however, has declined to follow the approach of the Fifth, Sixth, and Tenth Circuits. For example, in *United States v. $404,905.00 of U.S. Currency*, the Eighth Circuit held that additional detention for thirty seconds to two minutes after the traffic stop was complete was lawful. 182 F.3d 643, 649 (8th Cir. 1999), *abrogated by Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). The Eighth Circuit reasoned that a two-minute canine sniff was *de minimus*, noting, among other things the "strong interest in interdicting the flow of drugs on the nation's highways." *Id.*

3. *The United States Supreme Court's most recent foray into extended automobile stops:* Rodriguez v. United States*.* The United

States Supreme Court returned to the question of extended automobile stops in *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1609, 191 L. Ed. 2d at 492. In that case, the Supreme Court confronted the issue of whether the Fourth Amendment allows a dog sniff to be conducted after the completion of a traffic stop. *Id.* at ___, 135 S. Ct. at 1614, 191 L. Ed. 2d at 498.

The *Rodriguez* Court concluded that the dog sniff in that case may have unlawfully extended the duration of the stop and ordered the issue of independent justification for the dog sniff to be heard on remand. *Id.* at ___, 135 S. Ct. at 1616–17, 191 L. Ed. 2d at 501. The *Rodriguez* Court observed that when making a traffic stop, beyond determining whether to issue a ticket, an officer may engage in ordinary inquiries incident to the traffic stop, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499.

The *Rodriguez* Court, however, concluded that the stop may have extended beyond the circumstances justifying the stop and would thus be unlawful without additional reasonable suspicion. *Id.* at ___, 135 S. Ct. at 1616–17, 191 L. Ed. 2d at 501. Echoing *Caballes*, the *Rodriguez* Court emphasized a traffic stop prolonged beyond the "time reasonably required to complete [the stop's] mission" is unlawful. *Id.* at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500 (quoting *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846). In *Rodriguez*, the Supreme Court specifically declined to follow the reasoning of the Eighth Circuit in *$404,905.00 in U.S. Currency*. *Id.* at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499–501.

**D. State Caselaw.**

1. *Majority approach under Fourth Amendment to stops extended after original purpose of stop resolved.* A considerable number of states have considered the question of the validity of extended automobile stops. Most of them decide the issue under the Fourth Amendment, but a few have considered the issue under state constitutional provisions. Whether under the Fourth Amendment or under the state constitution, the majority of the cases have held that once the underlying reason for a traffic stop has been resolved, it cannot be lawfully extended.

For example, in *State v. Diaz,* the Florida Supreme Court considered a case in which an officer pulled over a motorist because he could not read the temporary tag on the top of the rear window. 850 So. 2d 435, 436 (Fla. 2003). Once the car was pulled over and the officer approached it, the officer was able to read the tag and learned that nothing was improper. *Id.* Nonetheless, the officer walked up to the driver's window and asked for the driver's information. *Id.* The driver could not produce a proper license and was ultimately convicted of felony driving with a suspended license. *Id.*

The Florida Supreme Court concluded that the seizure had been unlawfully extended after the underlying purpose of the stop had been resolved. *Id.* at 440. According to strong words of the Florida Supreme Court:

> It would be dangerous precedent to allow overzealous law enforcement officers to place in peril the principles of a free society by disregarding the protections afforded by the Fourth Amendment. To sanction further detention after an officer has clearly and unarguably satisfied the stated purpose for an initial stop would be to permit standardless, unreasonable detentions and investigations.

*Id.* at 439.

The Colorado Supreme Court came to a similar conclusion in *People v. Redinger,* 906 P.2d 81, 85–86 (Colo. 1995) (en banc). The *Redinger* court confronted facts similar to those in *Diaz.* An officer pulled over a vehicle after the officer could not see a license plate or temporary sticker on the rear of the vehicle. *Id.* at 82. When approaching the stopped car, however, the officer could plainly see a valid temporary plate properly displayed on the rear window on the driver's side. *Id.* The officer then approached the driver's window, explained the reason for the stop, but then extended the stop by asking for driver's license, registration, and proof of insurance. *Id.* When the driver removed a wallet from his jacket pocket, a plastic bag containing a white powdery substance fell onto his leg. *Id.* The officer then directed the driver to step out of the car, seized the bag, and asked the driver to identify the contents. *Id.* The driver identified the substance as methamphetamine and was charged with a drug crime. *Id.*

The Colorado Supreme Court held that the extended search violated the Fourth Amendment. *Id.* at 86. According to the Colorado Supreme Court, when "the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens." *Id.* 85–86. State appellate courts in Utah, Indiana, Kansas, Ohio, South Carolina, Texas, Maryland, and Washington have come to similar conclusions to the decision of the Florida Supreme Court in *Diaz* and the Colorado Supreme Court in *Redinger* under the Fourth Amendment. *See Holly v. State*, 918 N.E.2d 323, 326 (Ind. 2009); *Diaz-Ruiz,* 211 P.3d at 836; *Ferris v. State*, 735 A.2d 491, 500 (Md. 1999); *State v. Chatton,* 463 N.E.2d 1237, 1240–41 (Ohio 1984); *State v. Pichardo,* 623 S.E.2d 840, 852 (S.C. Ct. App.

2005); *Davis v. State*, 947 S.W.2d 240, 245–46 (Tex. Crim. App. 1997) (en banc); *State v. Morris*, 259 P.3d 116, 124 (Utah 2011); *State v. DeArman*, 774 P.2d 1247, 1249 (Wash. Ct. App. 1989).

2. *Cases refusing to allow extended stops under both Fourth Amendment and state constitutions.* In some cases, however, state supreme courts have invalidated extended searches under both state and federal search and seizure constitutional provisions. In *State v. Hayen*, the South Dakota Supreme Court considered yet another case in which an officer stopped a motorist because he was unable to see the expiration date on the bottom of the temporary thirty-day dealer's license. 751 N.W.2d 306, 307 (S.D. 2008). A box in the new pick-up truck obstructed the view of the bottom of the license when the officer followed the vehicle. *Id.* The officer, however, did not bother to look at the temporary license, but walked by and asked the motorist for driver's license and proof of insurance. *Id.* After this initial contact, the officer stepped back, saw the expiration date on the license, and determined it to be valid. *Id.*

The officer continued the stop by returning to his patrol vehicle to run a warrant and license check. *Id.* at 308. The warrant check revealed an outstanding warrant for the driver's arrest. *Id.* A search incident to arrest then revealed methamphetamine residue and drug paraphernalia in the driver's coat pocket. *Id.* The state charged the driver with possession of a controlled drug or substance and possession of drug paraphernalia. *Id.* The defendant filed a motion to suppress. *Id.*

In *Hayen*, the South Dakota Supreme Court, citing *McSwain*, held that the detention exceeded the lawful investigative stop and that the fruits of prolonged detention were properly suppressed. *Id.* at 311. Without any further articulable suspicion of criminal activity, the

extended detention violated Hayen's federal and state constitutional rights. *Id.*

A similar case is presented in *McGaughey v. State*, 37 P.3d 130 (Okla. Crim. App. 2001). In *McGaughey,* an officer observed a vehicle pass by and believed that the taillights on the back of the truck were not working. *Id.* at 132. The officer pulled the vehicle over. *Id.* When approaching the vehicle, the officer could see that, in fact, the taillights were functioning properly. *Id.*

Notwithstanding the officer's awareness of the functioning of the taillights, the officer asked the driver to step out of the car and asked for his driver's license. *Id.* at 132–33. The officer then continued to inspect the vehicle, observing a pistol in the driver's side door pouch. *Id.* at 133. After determining the gun belonged to the driver and was loaded, the officer asked if the driver would mind if he searched the vehicle, and the driver responded "go ahead." *Id.* The search revealed three bags of amphetamine between the two front seats. *Id.* The driver was then patted down and over $6000 in cash was seized and the driver arrested. *Id.* A later inventory search revealed more drugs and cash. *Id.*

The Oklahoma Criminal Court of Appeals held that the extended stop was unlawful. *Id.* at 141. According to the Oklahoma court,

> Although an officer effecting a valid traffic stop can require a driver to exit his car, and produce his license, and can check the validity of the inspections sticker on that vehicle, an officer who realizes that his stop of a vehicle was mistaken—and who has no other cause for reasonable suspicion of the driver—has no authority to further detain the driver or his vehicle. The seizure becomes illegal at the point where its initial justification has ceased and no new justification has arisen.

*Id.* 140–41. The Oklahoma court declared the search unlawful under both the search and seizure provision of article II, section 30 of the

Oklahoma Constitution and the Fourth Amendment of the United States Constitution. *Id.* at 140.

3. *Distinction between extended stop where underlying problem is resolved and ongoing investigation pursuant to valid stop.* A number of court decisions differentiate between a situation in which the original purpose has been resolved and when the original purpose of the stop is a valid and ongoing concern. *See McSwain*, 29 F.3d at 561. When the purpose of the original stop remains valid, a number of courts have held that a request for driver's license, insurance, and registration is not invalid as long as the stop is not unduly prolonged. *See, e.g., Trestyn*, 646 F.3d at 744; *McGaughey*, 37 P.3d at 140–41.

4. *State court outliers.* The state court cases, however, have not been unanimous. Other states have allowed a driver's license check under circumstances similar to the facts presented here. As a general matter, these states hold that if the traffic stop was initially supported by reasonable suspicion, a request for driver's license, registration, and insurance papers is permitted even after the problem that led to the initial stop has been resolved in favor of the driver. *See, e.g., State v. Gulick*, 759 A.2d 1085, 1090 (Me. 2000); *Hart v. State*, 235 S.W.3d 858, 861 (Tex. Ct. App. 2007); *State v. Williams*, 655 N.W.2d 462, 468 (Wis. Ct. App. 2002).

5. *Post-Rodriguez developments.* After *Rodriguez*, it is noteworthy that one state supreme court changed its course, at least under the Fourth Amendment. In *People v. Cummings*, the Illinois Supreme Court suppressed evidence resulting from an extended automobile stop. 6 N.E.3d 725, 733–34 (Ill. 2014). The United States Supreme Court granted certiorari, vacated the judgment, and remanded the case to the Illinois Supreme Court for consideration in light of *Rodriguez*. *Illinois v.*

*Cummings*, ___ U.S. ___, ___, 135 S. Ct. 1892, 1892, 191 L. Ed. 2d 760, 760 (2015) (mem.).

On remand, the Illinois Supreme Court stated that in light of *Rodriguez*, a driver's license request of a lawfully stopped driver is permissible irrespective of whether that request relates directly to the purposes of the stop. *People v. Cummings*, 46 N.E.3d 248, 253 (Ill. 2016). As a result, the Illinois Supreme Court reversed a lower court's suppression of the evidence. *Id.* Pointedly, the Illinois Supreme Court noted that the defendant did not raise a parallel claim under article I, section 6 of the Illinois Constitution. *Id.* at 250.

### E. Iowa Caselaw.

1. *The contours of* State v. Jackson. In *State v. Jackson,* we considered a case in which the defendant was stopped for lack of a license plate. 315 N.W.2d 766, 767 (Iowa 1982). Upon approaching the vehicle, the officer found the vehicle had a lawful properly displayed department of transportation paper plate. *Id.* After making that determination, the officer asked the driver if he had a valid driver's license. *Id.* The driver did not produce a license and admitted that he was driving while his license was under suspension. *Id.*

The defendant was subsequently charged with driving while his license was under suspension in violation of Iowa Code section 321A.32. *Id.* The district court granted a motion to suppress on the ground that there was no "articulate and specific reason to believe criminal activity [was] afoot." *Id.* The state appealed. *Id.*

On appeal, the state filed a short brief citing *Prouse* for the proposition that there is no requirement of articulable and reasonable suspicion to support a request for production of a driver's license. *See* Appellant's Br. in *Jackson* at 4–5. The reference to *Prouse* implies that

the Fourth Amendment may have been in play. There is no mention at all of the Iowa Constitution in the state's *Jackson* brief. The pro se defendant did not file a brief in the case and the state's position was thus unresisted.

In a brief two-page conclusory opinion, we held that the initial stop was valid under *Prouse*, 440 U.S. at 648, 99 S. Ct. at 1391, 59 L. Ed. 2d at 660. *Jackson*, 315 N.W.2d at 767. Citing only Iowa Code section 321.27 and no other authority, we further stated that "there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator's license." *Id.* This conclusion is stated, but perhaps because of the absence of a brief on behalf of the defendant, no reasoning is provided. Neither the Fourth Amendment nor the Iowa Constitution was mentioned in the opinion. *See id.*

*Jackson* was decided before the Supreme Court decided *Royer*. As noted by the court of appeals in this case, *Jackson* does not specifically address whether it is reasonable under the Fourth Amendment for the officer to prolong the detention of the motorist to demand his or her driver's license. In addition, there is certainly no holding under article I, section 8 of the Iowa Constitution in *Jackson*.

2. *Reemergence of independent state constitutional law.* As has been thoroughly canvassed in some of our other opinions, the Iowa Supreme Court has a long history of independent adjudication of state constitutional issues. In recent decades, we have reemphasized that independent constitutional tradition. In *State v. Cline*, we reexamined filaments in our prior law noting the ability of state courts to engage in independent constitutional analysis. 617 N.W.2d 277, 285 (Iowa 2000), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In *Cline*, we specifically declined to follow the approach of

the United States Supreme Court in *United States v. Leon,* 468 U.S. 897, 922, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677, 698 (1984). *Id.* at 293. Subsequent to *Cline,* we have engaged in independent state constitutional analysis in a number of search and seizure cases. *See, e.g., Short,* 851 N.W.2d at 481; *State v. Baldon,* 829 N.W.2d 785, 790–91 (Iowa 2013); *Pals,* 805 N.W.2d at 775; *Ochoa,* 792 N.W.2d at 262; *State v. Tague,* 676 N.W.2d 197, 206 (Iowa 2004).

3. *Recent Iowa cases involving traffic stops.* Since 2010, we have considered the legality of automobile stops in five cases. The first case is *State v. Vance,* 790 N.W.2d 775 (Iowa 2010). In *Vance,* we considered whether law enforcement had reasonable suspicion under the Fourth Amendment to stop a vehicle when the officers knew that the owner of the vehicle had a suspended driver's license and when the officers had no evidence or circumstances indicating that the registered owner was not the driver of the vehicle. *Id.* at 781. Joining a majority of jurisdictions, we held that under these circumstances, the officers had reasonable suspicion to make an initial stop. *Id.* at 781–83. In a footnote, however, we noted that counsel for Vance failed to raise the question of whether the basis for the stop continued to be valid upon the officer's discovery that the driver of the vehicle was not, in fact, the registered owner. *Id.* at 783 n.1. We also noted that counsel had failed to raise any claim that the stop was invalid under the Iowa Constitution. *Id.* at 780.

In *Vance,* we then proceeded to consider an Iowa constitutional claim that was preserved—namely, whether Vance's counsel provided ineffective assistance of counsel for failing to challenge the search of his car under the Iowa Constitution. *Id.* at 786. In *New York v. Belton,* the Supreme Court held under the Fourth Amendment that

> when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile [as well as] any containers found within the passenger compartment.

453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 775 (1981) (footnotes omitted). In a 1981 case, *State v. Sanders*, we adopted *Belton* as the proper analysis under the Iowa Constitution. 312 N.W.2d 534, 539 (Iowa 1981), *overruled by State v. Gaskins*, 866 N.W.2d 1, 16 (Iowa 2015).

After *Sanders* and by the time of *Vance*, *Belton* had come under heavy attack as overbroad. As noted in *Vance*, academic commentators sharply criticized the decision, eight states declined to follow it under their state constitutions, and the Supreme Court itself began to question broad readings of the case in its subsequent opinion. 790 N.W.2d at 787–90. Further, at the time *Vance* was pending, the United States Supreme Court had granted certiorari in *Arizona v. Gant*, 552 U.S. 1230, 128 S. Ct. 1443, 170 L. Ed. 2d 274 (2008) (mem.) (Certiorari granted to answer the question: "Does the Fourth Amendment require law enforcement officers to demonstrate a threat to their safety or a need to preserve evidence related to a crime of arrest in order to justify a warrantless vehicular search incident to arrest conducted after the vehicle's recent occupants have been arrested and secured?").

Under these circumstances, we stated in *Vance* that we would ordinarily proceed to determine whether counsel violated professional norms by failing to challenge *Sanders* and *Belton* under the Iowa Constitution. 790 N.W.2d at 789–90. We stopped short of finding counsel's performance deficient on direct appeal, however, on the ground that it was possible that trial counsel failed to raise a challenge to *Belton* because trial counsel may have reasonably believed that there were other

exceptions to the warrant requirement that would allow admissibility. *Id.* at 790. As a result, the matter was left for possible postconviction relief. *Id.*

In *Vance*, we did not, then, expressly hold that counsel had been ineffective for failing to challenge the search of the vehicle on Iowa constitutional grounds. However, there would have been nothing to leave for postconviction relief if *Sanders* and *Belton* remained good Iowa law.

Our next traffic-stop case is *Pals*, 805 N.W.2d at 767. The first issue in *Pals* was whether an officer could validly stop a vehicle for an ongoing civil infraction. *Id.* at 774. We concluded that such a stop was lawful under both the Fourth Amendment and the Iowa Constitution. *Id.* at 775. We next considered whether the scope of the search had unlawfully expanded after the initial valid stop. *Id.* We concluded, however, that the issue was not preserved in the district court and declined to address it. *Id.* at 776–77.

Finally, we considered whether a consent to the search was constitutionally sufficient. *Id.* at 777. We concluded that it was not. *Id.* While we recognized that many states had abandoned the United States Supreme Court's "totality of circumstances" vegetable-blender approach to consent in the search and seizure context found in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), in favor of the more rigorous knowing and voluntary approach of *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), we determined that it was not necessary to reach that issue. *Pals*, 805 N.W.2d at 779. Instead, we determined, for the purpose of the case before us, to apply *Schneckloth* "with teeth" to invalidate the consent to search because of its coercive features. *Id.*

Our next automobile-stop case is *State v. Tyler*, 830 N.W.2d 288 (Iowa 2013). In *Tyler*, we considered a case where an officer made a traffic stop based on a mistake of law, namely, that a license plate cover unduly obstructed his view of the plate and was unlawful. *Id.* at 290. After making the initial stop, the officer detected the odor of alcohol on the driver's breath. *Id.* at 291.

In considering the issues in *Tyler*, we examined a videotape of the stop which demonstrated that both the rear and front license plate covers were clear rather than tinted. *Id.* at 290–91. The officer who made the stop could plainly read the license plate as demonstrated by his call to dispatch providing the information. *Id.* at 291. The only claimed violation of law was a violation of Iowa Code section 321.37(3), which provided that any frame around the registration plate must permit full view of all numerals and letters printed on the plate. *Id.* at 294. We held that the statute was not violated and the officer had made a mistake of law in initiating the stop. *Id.* at 295–96. As a result, both the Fourth Amendment and the Iowa Constitution, article I, section 8 were violated.[2] *Id.* at 298.

We also noted there was evidence in the record indicating the officer has specifically targeted Tyler's vehicle for a stop for a reason other than an obscure license plate. *Id.* at 297. A friend of Tyler's with identical license plate covers passed by the officer without incident immediately prior to Tyler's arrest. *Id.* We observed in a footnote that

---

[2]After *Tyler*, the United States Supreme Court determined that a reasonable mistake of law could support reasonable suspicion for a traffic stop. *Heien v. North Carolina*, 574 U.S. ___, ___, 135 S. Ct. 530, 540, 190 L. Ed. 2d 475, 486 (2014). Of course, the ruling in *Tyler* under the Iowa Constitution is unaffected by *Heien*. Further, the approach in *Heien* would be very difficult to square with our rejection of the good-faith exception to the exclusionary rule under article I, section 8 of the Iowa Constitution in *Cline*, 617 N.W.2d at 293.

while Tyler—who was black—argued that he was a victim of racial profiling, we did not need to reach that particular issue in light of our resolution of the case. *Id.* at 297 n.4. We made the commonsense observation, however, that the possibility for racial profiling requires us to carefully review the objective basis for asserted justifications behind the traffic stops. *Id.*

The next case in our parade is *Gaskins*, 866 N.W.2d at 1. In *Gaskins*, an officer made a routine traffic stop for an expired license plate. *Id.* at 3. When the officer approached the vehicle, he smelled marijuana and confiscated a blunt from the driver. *Id.* A search of the passenger compartment of the vehicle revealed a small portable locked safe. *Id.* Police opened the safe without a warrant and discovered drugs, paraphernalia, and a gun. *Id.* We held that the search of the safe was unlawful under article I, section 8 of the Iowa Constitution. *Id.* In doing so, we specifically overruled *Sanders*, noting that it was no longer good law under the Iowa Constitution. *Id.* at 16.

The final case is *In re Property Seized from Pardee*, 872 N.W.2d 384 (Iowa 2015). *Pardee* involved a traffic stop that was prolonged by efforts to engage in a dog sniff for drugs. *Id.* at 385–86. In *Pardee*, we noted under the Fourth Amendment an officer " 'may conduct certain unrelated checks *during* an otherwise lawful traffic stop' but 'may not do so in a way that *prolongs the stop*, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " 872 N.W.2d at 393 (emphasis added) (quoting *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499).

**F. Analysis.** In developing the proper approach to the Iowa Constitution, we may look to United States Supreme Court opinions, dissents in those opinions, various federal precedents, state court

precedents, and any other persuasive authorities. *See Short*, 851 N.W.2d at 481; *Ochoa*, 792 N.W.2d at 264–67. Indeed, there is a healthy body of independent state constitutional law developing in the area of traffic stops. *See* Margaret M. Lawton, *State Responses to the* Whren *Decision*, 66 Case W. Res. L. Rev. 1039, 1046–54 (2015) (citing cases from Washington, New Mexico, and Alaska departing from the doctrine in *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), in which the United States Supreme Court unanimously held that traffic stops based on objective probable cause are reasonable regardless of the officers actual motivation for the stop).

We think the federal and state cases have some common themes. First, cabining official discretion to conduct searches is designed to prevent arbitrary use of police power. Limiting both the scope and duration of warrantless stops on the highway provides important means of fulfilling the constitutional purpose behind article I, section 8, namely, ensuring that government power is exercised in a carefully limited manner.

The caselaw repeatedly emphasizes that even *de minimus* extensions of traffic stops are not acceptable. The fountainhead case of the United States Supreme Court is *Royer*. It has been picked up in the caselaw with some enthusiasm. *See United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (finding six minutes measurably prolonged traffic stop); *United States v. Dolson*, 673 F. Supp. 2d 842, 867 (D. Minn. 2009) (finding a delay of one minute and twenty-four seconds to call drug task force to be an unlawful extension).

That said, it is possible that when there is a valid ongoing traffic stop officers may properly seek driver's identification, registration, and

insurance information. This distinction is well recognized in the caselaw. Here, however, there was no ongoing valid traffic stop.

We, of course, are not obliged to follow *Rodriguez* in our interpretation of article I, section 8 of the Iowa Constitution. In any event, nothing in *Rodriguez* is to the contrary. In dicta, Justice Ginsberg indicates that obtaining driver's license, registration, and insurance information is a normal part of an ordinary traffic stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499. But she was referring to a valid, ongoing stop, not a traffic stop in which the underlying reason for the stop has been satisfied. Early on, the *McSwain* case recognized the critical distinction between a case in which there is a violation or ongoing violation and one in which the basis for the stop has dissipated. 29 F.3d at 561. Other cases prior to *Rodriguez* emphasized the distinction as well. *See, e.g., State v. Williams*, 136 P.3d 579, 589 (N.M. Ct. App. 2006) (noting the state "ignore[d] the distinguishing fact in each case cited to support [its position]—the initial stop in each case was valid"); *Hayen*, 751 N.W.2d at 310 (distinguishing cases where actual traffic violation was present). A leading commentator on the Fourth Amendment emphasizes the distinction between a valid or ongoing investigation and one that has been resolved for purposes of records checks:

> The importance of the violation of law to the authority to run a check on a license and registration is illustrated by those cases holding that if there is a stopping on either reasonable suspicion or probable cause of a traffic violation which is determined immediately after the stop not to have been a violation at all, the officer may not continue the detention for a license/registration check.

4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3(c), at 510 n.162 (5th ed. 2012). Thus, the language

used by Justice Ginsberg in *Rodriguez* does not suggest a different result is required in this case.

And even if it did, we would not be deterred from pursuing our own independent path under the Iowa Constitution. Although this case raises distinctive issues, our recent traffic-stop cases have evinced an awareness of the potential for arbitrary government action on the state's roads and highways. In *Vance*, we severely questioned the rationale of our older precedent regarding searches of closed containers pursuant to an automobile stop in *Sanders*—a case we ultimately explicitly overruled in *Gaskins*. *See Gaskins*, 866 N.W.2d at 16; *Vance*, 790 N.W.2d at 787; *Sanders*, 312 N.W.2d at 539. In *Pals*, we put traffic stops in the larger context of concerns surrounding racial profiling. 805 N.W.2d at 772 n.2. That theme was continued in *Tyler* where we noted the stop involved an African-American driver in which a previous driver with similar features on the license plate was not stopped. 830 N.W.2d at 297 & n.4. These recent cases all have a common feature of demanding compliance with Iowa constitutional commands in the traffic-stop context.

We recognize, however, that officer safety is a legitimate and weighty interest in the context of traffic stops. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331, 336–37 (1977) (per curiam). Yet, as the Supreme Court stated in *Knowles*, the safety concerns arising out of a potential traffic citation are "a good deal less than in the case of a custodial arrest." 525 U.S. at 117, 119 S. Ct. at 487, 142 L. Ed. 2d at 498. Nonetheless, in *Mimms*, the Supreme Court held that an officer can direct a driver to get out of the car to ensure the officer's safety. 434 U.S. at 110–11, 98 S. Ct. at 333, 54 L. Ed. 2d at 337.

Yet, for a more intrusive *Terry*-type stop, reasonable suspicion is constitutionally required before the officers may engage in a pat-down search. *United States v. Clark,* 24 F.3d 299, 303 (D.C. Cir. 1994); *United States v. Coley*, 974 F. Supp. 41, 44 (D.C. Dist. 1997). There is no categorical approach to pat-down searches. The validity of a pat-down search, an important part of ensuring officer safety, depends upon the facts of each case. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (rejecting *Terry*-type pat-down based on "conclusory references to 'officer safety' ").

The same is true in the context of extending the duration of an automobile stop when the underlying problem has been resolved. While in most extended traffic-stop cases an officer safety claim has not been asserted, in cases where officer safety has been raised, the courts have repeatedly rejected generalized, unsubstantiated claims related to officer safety as a basis for extending a traffic stop. *See, e.g., United States v. Henderson*, 463 F.3d 27, 45–46 (1st Cir. 2006) (conclusory argument of officer safety not based on facts insufficient); *Smith*, 37 F. Supp. 3d at 812–13 (insufficient evidence of threat to safety to justify extended stop); *State v. McCaulley*, 831 N.E.2d 474, 476–77 (Ohio Ct. App. 2005) (no safety reasons for detention of driver in back seat of squad car). Here, there is no indication in the record that the officer feared for his safety. Indeed, the officer allowed the unhandcuffed driver to accompany him back to the vehicle when the officer conducted the search.

Further, our holding does not increase the risks of harm to officers, but in fact lessens it. Under the result in this case, the officer is required to allow the driver to go on his or her way after the resolution of the reason for the stop. This can be accomplished by a brief gesture, an announcement from the back of the vehicle, or a brief conversation at the

driver's window. In this case, it would have simply only required the officer to say "good-bye" to the driver and allow him to return to the car. In fact, any increased officer danger arises from continuing the detention of the driver while the license and warrant checks are conducted. Thus, the very outcome sought by the State in this case would increase danger to officers, not lessen it. Officer safety might be a valid concern when tethered to a suspect's continuing detention, but not when the suspect is free to go. The State is not entitled to relief from an exigency of its own creation.

As indicated above, it is not clear whether *Jackson* was a Fourth Amendment or article I, section 8 case. In any event, to the extent that *Jackson* is inconsistent with our holding today, we overrule it. We conclude that when the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion, article I, section 8 of the Iowa Constitution requires that the driver must be allowed to go his or her way without further ado.

**V. Conclusion.**

For the above reasons, we conclude that the motion to suppress should have been granted. We therefore vacate the decision of the court of appeals and reverse the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who dissent.

**WATERMAN, Justice (dissenting).**

I respectfully dissent and would affirm the district court ruling denying Coleman's motion to suppress, as did the court of appeals. Until today, a police officer who lawfully stopped a motorist could ask to see his or her driver's license, especially when the officer knew the driver was not the car's registered owner. Almost all Iowans, I believe, would find this activity completely unobjectionable and, indeed, mundane. But not the majority. Instead, our court has determined that this act of routine traffic enforcement violates the search and seizure provision of the Iowa Constitution. The United States Supreme Court reached the opposite conclusion under the Fourth Amendment in 2015. *See Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492, 499 (2015).

To get to its result, the majority overrules another one of our established search and seizure precedents. In *State v. Jackson,* we correctly decided a quarter century ago that the constitution does not require an officer who lawfully stops a vehicle to "treat the [driver] as if he had never seen him." 315 N.W.2d 766, 767 (Iowa 1982). Rather, after dispelling the original purpose for the stop, the officer could perform the minimally intrusive step of checking the driver's license, which Iowa drivers are required by statute to carry and display upon an officer's request. *Id.*; *see also* Iowa Code § 321.174(3) (2013) ("A licensee shall have the licensee's driver's license in immediate possession at all times when operating a motor vehicle and shall display the same upon demand of a . . . peace officer . . . ."). I would affirm Mr. Coleman's conviction for driving while barred by following our commonsense decision in *Jackson* and United States Supreme Court precedent explicitly allowing officers to

check the driver's license, vehicle registration, and proof of insurance as part of the routine mission of any traffic stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499.

We recently followed *Rodriguez* in *In re Property Seized from Pardee*, 872 N.W.2d 384, 391–93 (Iowa 2015), and have no good reason to depart from it here. Indeed, the Illinois Supreme Court within this past year unanimously applied *Rodriguez* to uphold a license check under the same facts presented. *People v. Cummings*, 46 N.E.3d 248, 252 (Ill. 2016).

Iowans who get pulled over expect to show their driver's license to the officer. This practice helps law enforcement get dangerous, illegal drivers off the road. The majority fails to mention why Coleman had been barred from driving. His criminal record includes four prior convictions for driving while barred, two prior convictions for driving while suspended, several narcotics convictions, and notably, a conviction for second-offense operating while intoxicated (OWI) committed *two days* before Officer Morris pulled him over. The majority gives Coleman a free pass.

The majority goes out of its way to connect this case, at least implicitly, to racial profiling. This is hardly the case to impugn motives of Iowa law enforcement. It is undisputed Officer Morris could not see the driver that night and did not know the driver's gender or race. He stopped the vehicle because its registered owner (a woman) had a suspended driver's license, and he reasonably assumed she was driving her own car. There is no evidence or claim by Coleman that Officer Morris pulled him over due to his race. *See Kothe v. State*, 152 S.W.3d 54, 64 (Tex. Crim. App. 2004) ("This is not an instance of an indefatigable Inspector Javert mercilessly pursuing, harassing, and hounding his

quarry through Paris sewers or Kendall County highways by concocting excuses to detain him."). To the contrary, Coleman's counsel expressly rejected this possibility in response to a question from a member of this court at oral argument. Officer Morris was entitled to ask for Coleman's driver's license and to detain him upon discovering he was driving while barred. After today, habitual offenders stopped under similar circumstances will be able to simply drive away without an identity check.

The majority flouts our error preservation rules to make another end run around precedent by deciding this case under a sua sponte interpretation of article I, section 8 of the Iowa Constitution.[3] Coleman never raised the Iowa Constitution in district court and never argued on appeal that it provided more restrictions on police than the Fourth Amendment. I would hold Coleman waived any claim for greater protection under the Iowa Constitution. I will now further develop the reasons for my dissent, beginning with the threshold issue of waiver.

**A. Error Preservation—the Iowa Constitution.** Coleman's motion to suppress filed in district court did not mention the Fourth

---

[3]*See State v. Gaskins*, 866 N.W.2d 1, 41 (Iowa 2015) (Waterman, J., dissenting) (criticizing majority opinion that diverged from settled federal precedent and "revers[ed] the district court for failing to credit an argument the defendant never made at trial"); *State v. Short*, 851 N.W.2d 474, 508 (Iowa 2014) (Waterman, J., dissenting) ("Today's majority . . . once again uses the Iowa Constitution to evade well-settled Fourth Amendment precedent without setting forth any principled basis for construing Iowa's nearly identically worded search and seizure provision to require greater restrictions on the law enforcement community and elected branches."); *State v. Baldon*, 829 N.W.2d 785, 837 (Iowa 2013) (Mansfield, J., dissenting) (noting majority had "venture[d] into state constitutional issues that no one has briefed"); *State v. Pals*, 805 N.W.2d 767, 784 (Iowa 2011) (Waterman, J., dissenting) ("Although Pals['s] appellate brief raised both the federal and Iowa constitutional search and seizure provisions, he never argued our state constitution provided broader protection.").

Amendment or Iowa Constitution,[4] nor did he cite to either constitution during the hearing on that motion.  Just last term, in *State v. Prusha*, we unanimously held the defendant failed to preserve a state constitutional search and seizure claim when he mentioned only the Fourth Amendment in district court.  874 N.W.2d 627, 630 (Iowa 2016).  Now, the majority finds error was preserved when trial counsel failed to mention *either* the Fourth Amendment or the Iowa Constitution.

So less has become more.  *See State v. Short*, 851 N.W.2d 474, 526 (Iowa 2014) (Mansfield, J., dissenting) ("[I]t almost seems as if a lawyer in this court would be wiser *not* to develop an Iowa constitutional argument.").  Constitutional jurisprudence should not be a race to the bottom.  Notwithstanding the State's incorrect statement that error was preserved, Coleman waived his belated claim for broader restrictions on police under article I, section 8 of the Iowa Constitution.[5]

---

[4]Coleman's motion to suppress stated in its entirety:

COMES NOW the Defendant by counsel and, pursuant to I.R.Cr.P. 2.11(2)(c) 2.12(1)(a), moves the Court for an order suppressing certain evidence seized as a result of a traffic stop, on or about August 18, 2014, on the ground that the stop was[sic] probable case: the registered owner of the vehicle was not under suspension.

The transcript of the oral hearing on the motion to suppress indicates the district court agreed with the State that our decision in *Jackson* controlled.  Coleman obtained different counsel for his appeal.

[5]The State in its appellate briefing indicated it "does not contest error preservation," presumably because it assumed we would honor our precedent to apply the federal standard when the defendant sought no different standard under the Iowa Constitution.  *See, e.g., State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013).  "Where a party raises both state and federal constitutional claims but does not argue that a standard independent of the federal approach should be employed under the state constitution, we ordinarily apply the substantive federal standards . . . ."  *Id.*  "[W]e generally decline to consider an independent state constitutional standard based upon mere citation to the applicable state constitutional provision."  *State v. Lowe*, 812 N.W.2d 554, 566 (Iowa 2012) (quoting *State v. Effler*, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., concurring specially)).  The State concluded, "Coleman cites both the state and federal constitutions, but does not argue that one requires a different analysis or result than the other.  As such, the Court should treat the claims coextensively."  I

By surprising the State with a new interpretation of our state constitution, the majority rewards trial counsel's silence and gives all defense counsel a perverse incentive to lay in the weeds in district court. This approach deprives the State of the opportunity to address the state constitutional claim at the trial level, perhaps by making a different evidentiary record. It also deprives the district court of the opportunity to rule on the state constitutional claim.

"Error preservation is important for two reasons: (1) affording the district court an 'opportunity to avoid or correct error'; and (2) providing the appellate court 'with an adequate record in reviewing errors purportedly committed' by the district court." *State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015) (quoting *State v. Pickett*, 671 N.W.2d 866, 869 (Iowa 2003)). We do not consider issues for the first time on appeal. *See Geisler v. City Council*, 769 N.W.2d 162, 166 (Iowa 2009). Because Coleman did not raise a claim under the Iowa Constitution in district court, I would find he did not preserve it. *See id.*

"Our obligation on appeal is to decide the case within the framework of the issues raised by the parties." *Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010). We should "do no more and no less." *Id.* The majority in this case unnecessarily overturns existing law sua sponte. In so doing, the majority violates the admonition so recently reiterated in *Feld*:

> [I]n the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change. In this case, we are restrained to apply the controlling law as advocated by the parties, and we do not

---

agree, but going forward the State should no longer rely on our precedent treating state and federal constitutional claims coextensively.

consider or forecast whether or not that controlling law should be abandoned or changed . . . .

*Id.* at 78 n.4 (citations omitted). The restraint exercised by our court in *Feld* should have been employed here.

Error preservation rules apply to the State and defendant alike. *DeVoss v. State,* 648 N.W.2d 56, 63 (Iowa 2002) ("Because error preservation is based on fairness, we think *both* parties should be bound by the rule.").[6] We should not reverse the district court for failing to credit an argument a party never made at trial. *See id.* ("Ordinarily, we attempt to protect the district court from being ambushed by parties raising issues on appeal that were not raised in the district court."). Judges cannot assume the role of a partisan advocate and do counsel's work. *See Hyler v. Garner,* 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments."); *see also State v. Hicks,* 791 N.W.2d 89, 97–98 (Iowa 2010) (declining to speculate as to argument not made at district court); *Feld,* 790 N.W.2d at 83 (Appel, J., concurring in part and dissenting in part) ("Judges are not advocates who reach out to decide questions the parties themselves either deem unimportant or, for whatever reasons, fail to raise. The job of the court is to decide concrete cases the parties bring to it."); *In re S.P.,* 719 N.W.2d 535, 539–40 (Iowa 2006) (stating "the court is prohibited from assuming the role of an advocate" and calling for "what Edmund Burke described as the 'cold neutrality of an impartial judge'" (quoting *State v. Glanton,* 231 N.W.2d 31, 35 (Iowa 1975))); *State v. Biddle,* 652 N.W.2d 191, 198 (Iowa 2002) (noting the "constitutional right

---

[6]For example, in *State v. Ochoa,* we concluded the state waived several grounds for upholding a warrantless search of a parolee's motel room based on consent because it failed to raise those grounds in district court. 792 N.W.2d 260, 291–92 (Iowa 2010).

to have a neutral and detached judge"); *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) (noting that we do not "assume a partisan role and undertake [a party's] research and advocacy").

When Coleman belatedly raised the Iowa Constitution on appeal, he never argued for a different standard than we apply under the Fourth Amendment. Therefore, our court should have applied the federal framework. *See, e.g.*, *Reilly v. Iowa Dist. Ct.*, 783 N.W.2d 490, 494 (Iowa 2010) ("Because Reilly has not advanced a standard for interpreting the due process clause under the Iowa Constitution different from its federal constitutional counterpart, we will apply the general principles as outlined by the United States Supreme Court."); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009) (applying Federal Eighth Amendment framework because defendant "has not advanced a standard for interpreting the cruel and unusual punishment provision under the Iowa Constitution differently"); *In re Det. of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant "ha[d] suggested no legal deficiency in the federal principles . . . nor ha[d] he offered an alternative test or guidelines").

"The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). We should not break from precedent and plow new ground without affording all parties the opportunity to address the issue in district court and on appeal. The risk of unintended consequences escalates when our court freelances. Constitutional errors cannot be fixed legislatively.

**B. The Search and Seizure Analysis.** To me, this is an easy case. As Judge McDonald observed in his special concurrence in this case, "*Jackson* is rooted in long-standing Fourth Amendment principles [that were] reaffirmed in *Rodriquez* and *Pardee*." It is undisputed that Officer Morris lawfully stopped Coleman. Officer Morris could not identify who was driving the moving vehicle at night and its registered owner had a suspended license. In *State v. Vance*, we determined

> an officer has reasonable suspicion to initiate an investigatory stop of a vehicle to investigate whether the driver has a valid driver's license when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle.

790 N.W.2d 775, 781 (Iowa 2010). Even when an officer is mistaken about a driver's identity, "[o]ur precedent is clear that a mistake of fact may justify a traffic stop." *Tyler*, 830 N.W.2d at 294. Having lawfully stopped Coleman, Officer Morris crossed no constitutional line by simply asking to see Coleman's driver's license.

The majority gives short shrift to the dispositive caselaw and reaches the wrong result through a meandering discussion of dissenting opinions and out-of-date precedent.[7] In *Rodriguez*, the Supreme Court, in a majority opinion authored by Justice Ginsburg, delineated the bounds of a traffic stop based on reasonable suspicion. 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 499. An officer stopped Dennys Rodriguez for driving on a highway shoulder, a violation of Nebraska law. *Id.* at ___, 135 S. Ct. at 1613, 191 L. Ed. 2d at 496. After attending to

---

[7]The majority first cites *Rodriguez* on page 16 after ten pages discussing earlier Fourth Amendment decisions. The majority first cites *Jackson* on page 23, after five additional pages discussing pre-*Rodriguez* cases from other states. In my view, a proper analysis should begin with the controlling precedent.

everything related to the stop, including checking the driver's license and issuing a warning citation, the officer detained Rodriguez for another seven to eight minutes to walk a drug-detection dog around the vehicle. *Id.* at ___, 135 S. Ct. at 1612, 191 L. Ed. 2d at 497. The Court held this seven- to eight-minute delay violated the Fourth Amendment if it was not supported by independent reasonable suspicion and remanded the case for determination of that issue. *Id.* at ___, 135 S. Ct. at 1616–17, 191 L. Ed. 2d at 500–01. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at ___, 135 S. Ct. at 1614, 191 L. Ed. 2d at 498 (citation omitted). The Court concluded the officer's mission ended after the time reasonably required to issue the warning citation. *Id.* at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500. The officer could not prolong the stop by detaining the driver to wait for the drug dog without independent reasonable suspicion. *Id.*

In so holding, the Court made clear that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842, 847 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* The Court stated these actions serve the same "objective" as the traffic code: "ensuring that vehicles on the road are operated safely and responsibly." *Id.* Rather than an interest in criminal enforcement, the

Court noted, these actions "stem[] from the mission of the stop itself." *Id.* at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500.

The Court contrasted these "negligibly burdensome precautions" with running a drug dog around the vehicle, which "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' " *Id.* at ___, 135 S. Ct. at 1615–16, 191 L. Ed. 2d at 499–500 (alteration in original) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 121 S. Ct. 447, 454, 148 L. Ed. 2d 333, 343 (2000)). "Lacking the same close connection to roadway safety as the ordinary inquiries," the Court held unrelated inquiries to search for other criminal wrongdoing could not prolong the duration of the stop without reasonable suspicion. *Id.* at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499.

Justices Thomas, Kennedy, and Alito dissented on the validity of the drug search, but all nine justices agreed the officer may obtain license and registration information as an ordinary incident of any lawful stop. *See id.* at ___, 135 S. Ct. at 1624, 191 L. Ed. 2d at 509 (Alito, J., dissenting) (noting the majority's conclusion that asking for driver's license and completing a records check on driver was "properly part of the traffic stop"). I would follow this unanimous contemporary decision of our nation's highest court.

We applied *Rodriguez* in *Pardee*, 872 N.W.2d at 391–93. A highway patrolman on a drug interdiction mission began trailing a car with California license plates and stopped the driver, John Saccento, for a broken taillight and following a semitrailer too closely. *Id.* at 386. Robert Pardee was a passenger in the car. *Id.* at 387. After twenty-five minutes, the trooper told the occupants they were free to go, but when they lingered, the officer resumed his questioning. *Id.* at 388. The officer, based on responses he found suspicious, detained Pardee and the

driver to run a drug dog around the vehicle. *Id.* We concluded the officer had unlawfully prolonged the duration of the stop without particularized suspicion of wrongdoing and reversed the district court's denial of Pardee's motion to suppress. *Id.* at 397. But we emphasized

> [a] dog sniff, *unlike matters such as* "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," can only be undertaken without individualized suspicion if it does not prolong the traffic stop.

*Id.* at 393 (emphasis added) (quoting *Rodriguez*, 575 U.S. \_\_\_, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499).[8] Thus, both *Rodriguez* and *Pardee* recognized that a license check is within the original mission of the traffic stop. These checks do not require separate, articulable, individualized suspicion because they fall within the scope of the stop.

Well before *Rodriguez* and *Pardee*, our precedent allowed an officer to check a driver's license once the driver had been stopped lawfully. In *Jackson*, a deputy sheriff pulled over a car driven by Louis Jackson because it had no license plate. 315 N.W.2d at 767. "Upon being alerted to the reasons for the stop, defendant directed the officer's attention to a properly displayed department of transportation paper plate." *Id.* At that point, reasonable suspicion for the stop dissipated. *Id.* But Jackson was unable to produce a driver's license and admitted his license had been suspended. *Id.* He was charged with driving under suspension. *Id.* Jackson filed a motion to suppress, stating,

> The request of the Defendant to see his license constituted a search and was violative of the court, the Fourteen[th] Amendment[] of the United States Constitution and the

---

[8]Two members of our court dissented, concluding the drug-dog search was lawful based on reasonable suspicion raised during the stop. *Pardee*, 872 N.W.2d at 397–98 (Cady, C.J. dissenting).

Constitution of the State of Iowa as being conducted without probabl[e] cause."

Def.'s Mot. to Suppress in *Jackson*, at 2. The district court granted the motion to suppress. *Jackson*, 315 N.W.2d at 767. We reversed the district court. *Id.* We held the officer was authorized to ask for the driver's license:

> The stop of defendant's vehicle was not a random or selective stop. His vehicle did not have license plates displayed. This failure would ordinarily be a violation of section 321.37, [t]he Code. When the department of transportation paper plates were pointed out to the officer there arose no requirement that he treat the defendant as if he had never seen him. Section 321.174, [t]he Code, requires all persons operating a motor vehicle upon a highway in the state to have immediate possession of a valid operator's license, and to display the same upon the demand of a peace officer. Notwithstanding the fact that a mistake concerning the license plates led to the defendant's stop there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator's license.

*Id.* I would follow *Jackson*.

The majority inaccurately suggests *Jackson* was undermined by *Florida v. Royer*, a 1983 decision correctly stating that investigatory stops should "last no longer than is necessary to effectuate the purpose of the stop." 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229, 238 (1983). The majority overlooks two subsequent Iowa decisions that belie its conclusion. First, in 2004, we upheld the arrest of a passenger on an outstanding warrant, unanimously holding that the officer did not violate the passenger's Fourth Amendment rights by checking his identification after the conclusion of a traffic stop. *State v. Smith*, 683 N.W.2d 542, 547–48 (Iowa 2004) ("The entire episode lasted but a minute; it was no more intrusive to check Smith's identification than to ask him a few

questions."). Here, Coleman voluntarily produced his identification to Officer Morris and makes no claim that encounter took over a minute.

Second, in 2005, we expressly reaffirmed *Jackson* in *State v. Lloyd*, when the officer initiated a traffic stop on a mistaken belief that a vehicle had no license plate but a temporary plate actually was in the rear window. 701 N.W.2d 678, 680 (Iowa 2005) (per curiam). The driver was charged and convicted of OWI, with a blood alcohol level over twice the legal limit. *Id.* at 679. We held the stop was valid and "there was nothing illegal about the fact that . . . [Lloyd] was asked to display his operator's license." *Id.* at 681 (quoting *Jackson*, 315 N.W.2d at 767). We cited with approval post-*Royer* Eighth Circuit precedent that allowed the officer to check the driver's identification after stopping the vehicle on the mistaken belief it failed to display a required license plate. *Id.* (citing *United States v. Smart*, 393 F.3d 767, 769 (8th Cir. 2005) (affirming conviction for felony possession of firearm discovered after check of identification showed driver was under suspension and a suspect in a recent shooting). Under the majority's new regime, after noticing the validly displayed plate, the officer could only wave on the driver, permitting someone like Lloyd to drive away drunk, and Smart, the shooting suspect and felon, to depart the scene armed.

It has long been settled in Iowa, well after *Royer*, that when an officer lawfully stops a vehicle based on a reasonable mistake of fact, the officer, after resolving that reason for the stop, could proceed to check the driver's license.[9] *See id.* Other jurisdictions, like Iowa, have

---

[9]In *Vance*, in dicta, we suggested (without citing *Jackson* or *Lloyd*) that the issue of whether an officer could request a driver's license from a detained motorist was debatable. *See* 790 N.W.2d at 783 n.1 ("Vance's counsel failed to raise in the district court or on appeal whether the stop continued to be valid upon the stopping officer's discovery that the driver of the vehicle was, in fact, not the registered owner. . . .

recognized that the Fourth Amendment does not prohibit asking a driver for identification after the reasonable suspicion that prompted the stop has dissipated.[10]

The majority relies on contrary state appellate decisions decided before *Rodriguez.* Those now outdated decisions concluded if an officer initiated a traffic stop based on reasonable suspicion from a mistaken observation, the officer could only inform the driver of the mistake and allow him or her to drive away. *See, e.g., State v. Morris*, 259 P.3d 116, 124 (Utah 2011). Such decisions are unpersuasive after *Rodriguez.*

Decisions applying *Rodriguez* consistently hold that an officer may request identification from a driver lawfully stopped even if reasonable suspicion for the stop has dissipated.[11] *See United States v. Reidy,* No. CR 13-71-BLG-DWM, 2016 WL 6208398, at *3 & n.3 (D. Mont. Oct. 24,

_____

Accordingly, we express no opinion on the merits of this issue because it has not been preserved for our appellate review."). *Vance* did not decide the issue and did not have the guidance of *Rodriguez*, which was decided five years later.

[10]*See, e.g., United States v. Elmore*, 304 F.3d 557, 561 n.1 (6th Cir. 2002) (concluding no Fourth Amendment violation resulted when officer approached driver to request license and registration after pulling over for no license plate and then seeing temporary tag in window); *State v. Godwin*, 826 P.2d 452, 456 (Idaho 1992) ("[A] police officer's brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the fourth amendment."); *State v. Hill*, 606 A.2d 793, 795 (Me. 1992) (determining after valid stop for mistaken traffic violation, asking for license was minimal intrusion and did not violate Fourth Amendment); *Hart v. State*, 235 S.W.3d 858, 862 (Tex. Ct. App. 2007) ("[W]here the initial traffic stop is valid, a license check of the driver, even if conducted after the officer has determined the motorist is not guilty of the violation for which he or she was originally stopped, is not unreasonable so long as it does not unduly prolong the motorist's detention."); *State v. Williams*, 655 N.W.2d 462, 469 & n.4 (Wis. Ct. App. 2002) (concluding that officer could have lawfully checked license after pulling over driver who was not registered owner with a suspended license).

[11]Several courts have continued to refer to the majority rule without addressing the impact of *Rodriguez. See, e.g., United States v. Fuller*, 120 F. Supp. 3d 669, 681–82, 685 (E.D. Mich. 2015) (citing *Rodriguez* without analysis); *State v. Hollister*, No. 112,983, 2016 WL 197742, at *8 (Kan. Ct. App. Jan. 15, 2016) (per curiam) (no citation to *Rodriguez*).

2016) (ruling that deputy who pulled over driver on suspicion that license plate was inadequately illuminated could check driver's license first); *State v. Allen*, 779 S.E.2d 248, 251, 254–55 (Ga. 2015) (holding that *Rodriguez* permitted officer to check identification of a passenger as "part of the authorized mission of the traffic stop"); *Cummings*, 46 N.E.3d at 252; *State v. Cotter*, No. 2015AP1916-CR, 2016 WL 4468406 (Wis. Ct. App. Aug. 25, 2016) (per curiam) ("Consistent with *Rodriguez*, as well as with Wisconsin precedent . . . , [the officer], after determining that he could not issue a ticket on the basis for which the stop was initiated, was permitted to continue the stop for purposes of completing routine matters such as gathering Craig Tomlinson's license information . . . .").

The Illinois Supreme Court twice addressed the issue, before and after *Rodriguez*, in a factually analogous case, *People v. Cummings*, 6 N.E.3d 725, 727 (Ill. 2014) (*Cummings I*), *cert. granted, judgment vacated sub nom. Illinois v. Cummings*, ___ U.S. ___, 135 S. Ct. 1892, 191 L. Ed. 2d 760 (2015) (mem.), *decision after remand*, 46 N.E.3d 248 (Ill. 2016) (*Cummings II*). Derrick Cummings was driving a van owned by a woman named Pearlene Chattic. *Cummings I*, 6 N.E.3d at 727. A police officer initiated a traffic stop because Chattic had a warrant for her arrest. *Id.* The officer knew Chattic was a woman. *Id.* at 728. After stopping the vehicle, the officer saw the driver was a male. *Id.* The officer nevertheless asked for his license and registration. *Id.* Cummings had no license and was arrested. *Id.* The trial court granted Cummings's motion to suppress, and the Illinois Supreme Court initially affirmed, holding that reasonable suspicion "disappeared when [the officer] saw that the defendant was not a woman and, therefore, could not be Chattic." *Id.* at 731. The court concluded that requesting

Cumming's license "impermissibly prolonged the stop." *Id.* at 731, 734. Two justices dissented, stating,

> The majority's rule, while narrow in this case, casts a wider shadow—that officers need an independent basis for requesting a driver's license in a lawful traffic stop. This result protects a driver from an objectively and subjectively minimal intrusion, at the expense of complicating law enforcement in a situation "especially fraught with danger to police officers."

*Id.* at 738 (Garmin, C.J., dissenting) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469, 3480, 77 L. Ed. 2d 1201, 1218 (1983)).

The United States Supreme Court granted certiorari and vacated the judgment, remanding to the Illinois Supreme Court "for further consideration in light of *Rodriguez v. United States*." *Illinois v. Cummings*, ___ U.S. at ___, 135 S. Ct. at 1892, 191 L. Ed. 2d at 760. On remand, the Illinois Supreme Court upheld the officer's actions. *Cummings II*, 46 N.E.3d at 251. The Illinois Supreme Court observed that *Rodriguez* established

> [t]he seizure's mission consists of the purpose of the stop—in *Rodriguez*, traffic enforcement—and "related safety concerns." Those related safety concerns include "ordinary inquiries incident to [the traffic] stop," and typically "involve checking the driver's license . . . ."

*Id.* (quoting *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614–15, 191 L. Ed. 2d at 498–99). The Wisconsin Court of Appeals reached the same conclusion applying *Rodriguez* under nearly identical facts. *Cotter*, 2016 WL 4468406, at *5. I find the *Cummings II* court's analysis of *Rodriguez* persuasive.

"Ordinary inquiries within the traffic stop's mission clearly do not offend the fourth amendment." *Cummings II*, 46 N.E.3d at 251. In rejecting the defendant's argument that a license check must relate to the initial purpose of the stop, the Illinois Supreme Court reasoned,

> *Rodriguez* makes clear that unrelated inquiries impermissibly prolong the stop beyond its original mission when those inquiries are not precipitated by reasonable suspicion. *Ordinary inquiries incident to the stop do not prolong the stop beyond its original mission, because those inquiries are a part of that mission.* Indeed, defendant's view would collapse the two parts of the mission—the initial purpose of the stop and ordinary inquiries of the stop—into just the purpose of the stop. Nothing in *Rodriguez* suggests that license requests might be withdrawn from the list of ordinary inquiries for a nontraffic enforcement stop.

*Id.* at 252 (emphasis added) (citations omitted). Reasonable suspicion may dissipate when the officer fulfills one part of the mission of the stop—to address the perceived traffic violation. However, the officer can still proceed to fulfill the other part of the mission by attending to related safety concerns, such as checking the driver's license. *See Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614, 191 L. Ed. 2d at 498.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S. Ct. 330, 332, 54 L. Ed. 2d 331, 335 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878, 20 L. Ed. 2d 889, 904 (1968)). We must weigh the "balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 109, 98 S. Ct. at 332, 54 L. Ed. 2d at 336 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 2579, 45 L. Ed. 2d 607, 614–15 (1975)); *see also State v. DeWitt*, 811 N.W.2d 460, 468 (Iowa 2012) ("[T]he test for reasonableness of police conduct 'requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests

at stake.' " (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443, 455 (1989))).

Checking a driver's license is within a traffic stop's original mission and is minimally intrusive. The balancing of interests easily favors the State, given the importance of ensuring that drivers who are lawfully stopped are in fact authorized to drive on Iowa roads. These "negligibly burdensome precautions" an officer takes to "complete his mission safely" are reasonable under the Fourth Amendment. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500. I reach the same conclusion under the Iowa Constitution.

States have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles." *Delaware v. Prouse*, 440 U.S. 648, 658, 99 S. Ct. 1391, 1398, 59 L. Ed. 2d 660, 670 (1979). Licenses are issued "to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle." *Id.* "[D]rivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves." *Id.* at 659, 99 S. Ct. at 1399, 59 L. Ed. 2d at 671; *see also State v. Mitchell*, 498 N.W.2d 691, 694 (Iowa 1993) ("The State has a valid interest in the safety of its citizens on its roads and highways."). Coleman, a habitual offender, was driving while barred at the time he was pulled over by Officer Morris.

> Motorists whose careless or reckless driving is so serious as to lead to license suspension constitute a genuine threat to the safety of their fellow citizens, few of whom will appreciate that today's decision places them at greater risk of injury.

*Holly v. State*, 918 N.E.2d 323, 327 (Ind. 2009) (Shepard, C.J., dissenting). I share the concern that today's decision will put the driving public at greater risk.

If a motorist with a suspended license—who is detained but allowed to drive away without being identified—later harms someone, it "will be difficult 'to explain to the family' of an innocent injured party that the police had a chance to prevent the injury but were powerless to act." *Id.* (quoting *Virginia v. Harris*, 558 U.S. 978, 978, 130 S. Ct. 10, 12, 175 L. Ed. 2d 322, 324 (2009) (Roberts, C.J., dissenting from denial of certiorari)). Coleman exemplifies the reason officers should be able to check whether a driver they lawfully stop is barred from our roadways. He was pulled over by Officer Morris two days after he was arrested for a second-offense-drunk-driving charge, following at least six prior convictions for driving while barred or suspended and multiple convictions for possession of narcotics.

Iowa Code section 321.174 obligates drivers to possess a valid license and have it in their possession at all times when driving. *Id.* § 321.174(3). Drivers are required to display the license upon demand by a peace officer. *Id.* "The statutory authority for police to demand a driver's license would mean little if the police could not check the validity of the license." *State v. Ellenbecker*, 464 N.W.2d 427, 430 (Wis. Ct. App. 1990).

> The reason for allowing police to request a driver's license on demand is to deter persons from driving without a valid license, since a license is a statement that the driver can be expected to comply with the state's requirements for safe driving. Where it is reasonable for a police officer to ask for a license, running a status check on the license is simply carrying out this deterrent function of the law.

*Id.*; *see also Godwin*, 826 P.2d at 455 (same); *People v. Redinger*, 906 P.2d 81, 88 (Colo. 1995) (en banc) (Vollack, C.J., dissenting) ("Because motorists are required by state law to carry a driver's license,

registration, and proof of insurance when operating a motor vehicle, Officer Wise's request for such documents was proper.").

Officers may request proof of liability insurance during a lawful traffic stop, even without an accident. *See State v. Acevedo*, 705 N.W.2d 1, 2 (Iowa 2005) (stating defendant was stopped for traffic offense and arrested when operating without a license and without proof of insurance). Iowa has a valid interest in enforcing laws requiring liability insurance to protect accident victims. Allowing officers to request proof of insurance deters uninsured drivers. In the same vein, checking identification during a lawful stop deters barred motorists who may wreak havoc on our roadways. The majority undermines these legislative goals.

Asking a driver for a license also promotes "transparency in traffic stops." *Cummings I*, 6 N.E.3d at 739 (Garmin, C.J., dissenting) (citing 625 Ill. Comp. Stat. Ann. 5/11-212 (West 2012) (requiring law enforcement officers to gather statistical information on drivers stopped or cited and department of transportation to analyze data and assess practices that resemble racial profiling)). As the Wisconsin Court of Appeals noted,

> In many cases, police officers are required to make a written report of contacts with citizens. An officer needs to know whom he or she is assisting in the event a citizen later complains about improper behavior on the part of the officer or makes any kind of legal claim against the officer.

*Ellenbecker*, 464 N.W.2d at 430. "Requesting identification may also be beneficial if the seemingly innocuous activity the officer observes later turns out to be illegal—for instance, if the vehicle turns out to have been stolen." *State v. Huck*, No. 2014AP2120–CR, 2015 WL 423239, at *4 (Wis. Ct. App. Feb. 3, 2015); *see also State v. Calzadas*, No. 2015AP162–

CR, 2015 WL 5146526, at *2 (Wis. Ct. App. Sept. 3, 2015). Officer Morris knew by his gender that Coleman was not the registered owner of the car.[12] What if minutes after the officer had allowed the driver to depart unidentified, the real owner reported the car stolen?

The safety of the officer is another reason to permit checks of the driver's identity. This safety interest "stems from the mission of the stop itself." *Rodriguez,* 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500. "Traffic stops are 'especially fraught with danger to police officers.' " *Id.* (quoting *Arizona v. Johnson,* 555 U.S. 323, 330, 129 S. Ct. 781, 786, 172 L. Ed. 2d 694, 702 (2009)). The *Cummings II* court recognized that *Rodriguez* relies in part on *United States v. Holt,* which "approved criminal record and warrant checks 'even though the purpose of the stop had nothing to do with such prior criminal history.' " *Cummings II,* 46 N.E.3d at 252 (quoting *United States v. Holt,* 264 F.3d 1215, 1221 (10th Cir. 2001), *abrogated on other grounds by United States v. Stewart,* 473 F.3d 1265, 1269 (10th Cir. 2007)). These checks were justified because "an officer will be better appri[s]ed of whether the detained motorist might engage in violent activity during the stop." *Id.* (alteration in original) (quoting *Holt,* 264 F.3d at 1222). License checks were relevant to officer safety regardless of the original purpose of the stop:

> To the extent the ordinary inquiries are justified by the officer safety interest, defendant's view would also require a conclusion that it is the type of stop, and not the occurrence of the stop itself, that generates danger for officers. The relevant authorities instead reveal it is the stop itself that poses danger.

---

[12]In some cases, the officer may be unable to determine the driver is not the registered owner until he or she checks the driver's license. Some people appear older or younger than their age; even race or gender may not be immediately apparent in a darkened vehicle.

*Id.* (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500).

Traffic stops are inherently dangerous because they involve close officer contact with unsecured individuals.[13]  *See Long*, 463 U.S. at 1052, 103 S. Ct. at 3482, 77 L. Ed. 2d at 1221–22; *see also State v. Smith*, 739 N.W.2d 289, 291 (Iowa 2007) (noting defendant stopped for speeding fired four shots at officer who was unaware vehicle stolen).  The Supreme Court has repeatedly acknowledged the weighty government interest in officer safety during traffic stops.[14]  "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder."  *Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 186, 124 S. Ct. 2451, 2458, 159 L. Ed. 2d 292, 303 (2004).  Officers

---

[13]Statistics from the Federal Bureau of Investigation indicate that a traffic stop poses the second-greatest risk of death for an officer, after investigation of a suspicious person, and the third-greatest risk of assault.  More officers have been killed during traffic violation stops than in attempting an arrest for burglary, robbery, or drugs, or in responding to domestic abuse violence calls.  U.S. Dep't of Justice, FBI, *Law Enforcement Officers Feloniously Killed & Assaulted* Table, https://UCR.fbi.gov/leoka/2014/home (follow "Overview" of officers feloniously killed hyperlink; then follow "Table 21" hyperlink); *Id.* Table 79 (follow "Overview" of officers assaulted hyperlink; then follow "Table 79" hyperlink).  In 2005–2014, ninety-three officers were killed during traffic stops.  *Id.* Table 21.

[14]*See Johnson*, 555 U.S. at 330–32, 129 S. Ct. at 786–87, 172 L. Ed. 2d at 702–03 (holding officer authorized to perform pat-down on passenger because of safety interest of officer); *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S. Ct. 882, 885, 137 L. Ed. 2d 41, 47 (1997) (recognizing "traffic stops may be dangerous encounters" and citing statistics of officers killed during traffic stops in 1994); *Long*, 463 U.S. at 1052, 103 S. Ct. at 3482, 77 L. Ed. 2d at 1221–22 ("[W]e stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation 'at close range' when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . .' " (quoting *Terry*, 392 U.S. at 24, 28, 88 S. Ct. at 1881, 1883, 20 L. Ed. 2d at 908, 910); *Mimms*, 434 U.S. at 110, 98 S. Ct. at 333, 54 L. Ed. 2d at 336 (stating government's interest in safety is "both legitimate and weighty" and "specifically recogniz[ing] the inordinate risk confronting an officer as he approaches a person seated in an automobile"); *Terry*, 392 U.S. at 23, 88 S. Ct. at 1881, 20 L. Ed. 2d at 906 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

initiating these stops "need to know who[] they are dealing with in order to assess the situation [and] the threat to their own safety." *Id.*

We should balance this weighty government interest against the minimal intrusion on the defendant's liberty interest. "[W]hen stopped for a traffic violation, a motorist expects 'to spend a short period of time answering questions and waiting while the officer checks his license and registration.' " *Holt,* 264 F.3d at 1220 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S. Ct. 3138, 3149, 82 L. Ed. 2d 317, 333 (1984)); *see also Hiibel*, 542 U.S. at 186, 124 S. Ct. at 2458, 159 L. Ed. 2d at 302 ("Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."). Most Iowans will be quite surprised to hear Officer Morris violated Coleman's constitutional rights by asking to see his driver's license after lawfully stopping the car he was driving.

In *Mimms*, the Supreme Court held that an officer can require a driver to step out of a vehicle during a traffic stop based on officer safety concerns. 434 U.S. at 111, 98 S. Ct. at 333, 54 L. Ed. 2d at 337. The Court determined the intrusion requiring the driver to get out of the car was "*de minimis.*" *Id.* "The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." *Id.* In *Wilson*, the Court expanded this analysis to allow officers to order passengers out of the vehicle. 519 U.S. at 413–14, 117 S. Ct. at 886, 137 L. Ed. 2d at 47. The Court reasoned,

> On the personal liberty side of the balance, the case for the passengers is in once sense stronger than that for the driver. There is probable cause to believe the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the

> stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car.

*Id.* Indeed,

> many people would find providing their identification to a police officer for a computer records check far less intrusive than being ordered out of the car to stand on the shoulder of a busy highway or on the side of a street in their neighborhood.

*Allen,* 779 S.E.2d at 256; *see also United States v. Soriano-Jarquin,* 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (Citation omitted)); *cf. Smith,* 683 N.W.2d at 547–48 (holding officer did not "seize" passenger by requesting identification).

The Supreme Court has stressed the need to evaluate the initial detention and scope of the stop to ensure traffic stops are not used as "fishing expedition[s]." *Ohio v. Robinette,* 519 U.S. 33, 41, 117 S. Ct. 417, 422, 136 L. Ed. 2d 347, 356 (1996). "But the Supreme Court has expressly rejected placing any rigid time limitations on *Terry* stops; instead, the issue is 'whether the police diligently pursued a means for investigation that was likely to confirm or dispel their suspicions quickly . . . .' " *Kothe,* 152 S.W.3d at 64 (quoting *United States v. Sharpe,* 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605, 616 (1985)). A traffic stop's mission includes both "an investigation into the specific suspected criminal activity and a routine check of the driver's license," but "neither the Fourth Amendment nor the Supreme Court dictate that an officer . . . must investigate the situation in a particular order." *Id.* at 65.

Here, there is no evidence—or even suggestion—that Officer Morris failed to diligently pursue the mission of the traffic stop. Neither Coleman nor the majority contend this traffic stop was unduly prolonged by the request to see a driver's license, which likely transpired in less than a minute.

For these reasons, I do not join the majority's conclusion that Officer Morris violated Coleman's rights under the Iowa Constitution.

Mansfield and Zager, JJ., join this dissent.